UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

ALBERTO LUIS MALDONADO,                        MEMORANDUM AND ORDER
                          Plaintiff,
           - against -                         12-CV-5297 (JO)
COMMISSIONER OF SOCIAL SECURITY,
                          Defendant.
--------------------------------------------------------X

James Orenstein, Magistrate Judge:

         Plaintiff Alberto Luis Maldonado ("Maldonado") challenges the determination by the

defendant Commissioner of Social Security ("Commissioner"), that Maldonado is not entitled to

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* (the

"Act"). *See* Docket Entry ("DE") 1 (complaint); 42 U.S.C. §§ 405(g), 1383(c)(3). The parties have

consented to refer the case to me for all purposes including the entry of judgment. DE 13; *see* 28

U.S.C. § 636(c). Both parties have moved for a judgment on the pleadings. DE 17; DE 21. In

particular, Maldonado seeks an order remanding the case to the Social Security Administration

("SSA") solely to enter a finding of disability to award him benefits; alternatively, he seeks a new

hearing. DE 18. For the reasons set forth below, I deny Maldonado's primary request for a finding

of disability, grant his request to remand the case for a new hearing, and I deny the Commissioner's

cross-motion.

I.       Background

         A.       Procedural History

         Maldonado injured his back, neck, and shoulders during an accident at work on March 11,

2009. On September 17, 2009, he applied for Title II disability benefits as of the date of his injury.

DE 7 (Administrative Record, or "AR") at 74. The SSA denied the application on March 2, 2010,

and then denied Maldonado's request for reconsideration on August 11, 2010. AR at 81, 95.

Maldonado sought administrative review on September 10, 2010. *See* AR at 113-14; 42 U.S.C. § 405(b)(1).

The assigned Administrative Law Judge ("ALJ") held a hearing on September 2, 2011, at which Maldonado was represented by counsel. AR at 25-73. On October 12, 2011, the ALJ determined that Maldonado was not disabled within the Act's meaning. AR at 20. Specifically, the ALJ found that although Maldonado was unable to continue working in his previous position as a chemist/salvage laborer, he retained the residual functional capacity ("RFC") to perform light work with the following limitations: (1) sit or stand as needed; (2) bend, balance, stoop, crawl, kneel, crouch, or climb ramps and stairs only occasionally; (3) never climb ropes or ladders; (4) perform push and pull activities or overhead work with upper extremities only occasionally; (5) frequently finger, handle, or grasp; (6) no exposure to hazardous machinery; and (7) perform only simple, repetitive, routine tasks. AR at 13. After hearing testimony from a vocational expert, the ALJ found that this RFC allowed Maldonado to perform jobs existing in significant numbers in the national economy based on his age, education, and work experience. AR at 19. Maldonado sought administrative review of that unfavorable decision on November 21, 2011. AR at 146. The SSA Appeals Council denied the request on August 21, 2012, thereby rendering the ALJ's decision final for the Commissioner. AR at 1-5; *see Talavera v. Astrue*, 697 F.3d 145, 150 (2d Cir. 2012); 42 U.S.C. § 405(g). Maldonado then filed the instant action on October 19, 2012. DE 1.

    B.    <u>Facts</u>

        1.    <u>Maldonado's History and Hearing Testimony</u>

Maldonado was born on March 27, 1959. AR at 74. He has a bachelor's degree in chemistry. AR at 35. Maldonado worked as a chemist from 1986 to 2004, and then as a truck driver

from March 2006 to July 2007. AR at 94, 183. In his last job as a chemist/salvage laborer at a hazardous waste collection company from July 2007 to March 2009, Maldonado lifted and carried items weighing anywhere from twenty pounds to hundreds of pounds. AR at 33, 94. When an item weighed hundreds of pounds, he used a partner to lift and carry it or they would roll the item instead. AR at 33.

On March 11, 2009, a few weeks before his fiftieth birthday, Maldonado slipped on a plastic bag at his work place, fell on the floor, and suffered injuries to his neck, shoulders, and back. AR at 35, 74, 182. As a result of his injuries, Maldonado has not had substantial gainful employment since his accident. AR at 182.

Maldonado initially went to an emergency room for treatment, AR at 227-32, and then later underwent two arthroscopic shoulder surgeries on January 15, 2010 and June 18, 2010. AR at 376-77, 474-75. Maldonado has also been hospitalized for mental health issues, has received additional treatment from several physicians for his symptoms, and has attended physical therapy sessions, as detailed further below.

In his initial disability benefits application, Maldonado reported numbness in his hands and feet and asserted that his injuries made it nearly impossible to stand or walk, lift his arms, dress himself, prepare food, or reach for food in the refrigerator. AR at 182. In his application for reconsideration, Maldonado reported that the pain had gotten worse. AR at 195. He continued to have difficulty dressing and bathing himself and he received help from other people "to do everything." AR at 199. In September 2010, Maldonado reported that his pain was more severe and that he was unable to move his arms over his head. AR at 204. He continued to have difficulty showering, dressing, and cooking. AR at 207.

At the hearing, in response to the ALJ's questions about his condition, Maldonado testified as follows:

- He suffered from constant headaches, for which he took medication. AR at 37-38.

- Pain and dizziness prevented him from lifting his head all the way up and all the way down. AR at 39.

- In order to look from left to right, he had to turn his body, not his neck, due to pain. AR at 40.

- Maldonado believed that his two surgeries did not improve either of his shoulders; both had worsened in terms of pain and mobility. AR at 42, 45.

- Maldonado could not raise his right arm over his head when the ALJ asked him to do so. AR at 43.

- He could raise his right arm straight out in front of him for only several seconds before it became painful and numb. AR at 44.

- Maldonado could not raise either of his arms straight out to the side due to pain. AR at 44.

- Maldonado was able to open and close his fist, but felt radiating pain from his neck down to his fingers in both arms. AR at 46.

- Maldonado testified to feeling pain in his lower back down to his legs and feet, which was alleviated by medication. AR at 46-47, 50.

- He also testified to having back pain while sitting, which was alleviated by changing his position after thirty minutes to standing or lying down. AR at 47.

- Standing was the worst position for him generally. AR at 47.

- Maldonado testified that his back pain was intermittent, but that normally the pain causes him to stay in bed or in a recliner. AR at 51.

- On days when he feels pain in his neck, shoulders, and back simultaneously, Maldonado takes medication and lies down all day. AR at 63.

- Maldonado uses a cane because sometimes his knees collapse, causing him to fall down. AR at 51.

Maldonado also made the following assertions about his daily activities since the accident:

- He usually stays at home in his recliner or in bed and does not do yard work or attend church. AR at 52-53 ("I'm housebound pretty much").

- He tries to clean dishes but usually drops them because of his back pain. As a result, he only uses plastic dinnerware. AR at 52.

- He has difficulty holding plates in his hands. AR at 56-57.

- He can hold a pen to sign his name but not to write a full paragraph. AR at 58.

- He can button his shirt but cannot bend down to tie his shoes. AR at 58.

- Maldonado's fiancée does all of the housework and helps him get dressed, bathes him, and opens his medication. AR at 60.

- On a good day, Maldonado can stand or walk for ten to fifteen minutes; on other days, only for one minute. AR at 61.

- After ten to fifteen minutes of standing, he has to lay down for the rest of the day. AR at 61.

- Maldonado surmised that he could sit in an office chair that reclined for about thirty minutes and in a recliner all day. AR at 62.

- Describing his ability to lift weight, Maldonado testified that he could hold a gallon of milk and pour himself a glass if he was holding it close to his body, but that he could not reach into the refrigerator and pull out the gallon because of pain. AR at 62-63.

- He had a difficult time on a three-hour flight to the Dominican Republic for a family emergency. AR at 64.

    2.    Maldonado's Treatment and Therapy

    a.    Potomac Hospital emergency room. Immediately after the accident, doctors at the

Potomac Hospital emergency room found mild degenerative changes in Maldonado's pelvis, with

no evidence of fracture or dislocation. AR at 229. Maldonado suffered from moderate to severe

narrowing in his lumbosacral spine within the L4-L5 disc spaces with mild to moderate anterior

5

osteophytic spurring, mild anterior osteophytic spurring at L2-L3 and L3-L4, and mild left L4-L5 facet arthropathy. There was no evidence of fracture or dislocation in his shoulders, but doctors noted mild spurring in both shoulders and calcification in the right shoulder. Maldonado was prescribed Percocet, Ibuprofen, and Robaxin. AR at 229-32.

b. <u>MRI of Woodbridge</u>. MRIs were taken of Maldonado's neck, back, and shoulders a few months after the accident. MRI results from April 9, 2009, revealed that Maldonado suffered from multilevel spondylosis and disc disease, focal canal stenosis, and multiple levels of foraminal narrowing in his neck. Based on MRI results from April 13, 2009, there was mild to moderate multilevel degenerative disc disease in his lumbar spine with no evidence of significant central nerve root impingement and a suspected annular tear. The MRIs taken of both shoulders on July 27, 2009, showed that Maldonado suffered from a full thickness rotator cuff tear and possible degeneration or fraying of the superior labrum in his right shoulder. In his left shoulder, there was no evidence of a full thickness rotator cuff tear, but the MRI suggested an intrasubstance tear or tendinosis, bursitis, and degeneration at the superior labrum. AR at 233-39.

c. <u>Inova Health System</u>. Maldonado received epidural steroid injections in his cervical spine on October 5, 2009, and in his lumbar spine on May 20, 2009; June 3, 2009; and June 17, 2009. AR at 273-74, 277. Anteroposterior and lateral films on June 3, 2009, revealed degenerative osteophytes in the distal spine at L4-L5 and L5-S1, as well as facet sclerosis and intervertebral disc space narrowing at L5-S1. AR at 275.

d. <u>Prince William Hospital</u>. Maldonado was admitted to Prince William Hospital on August 24, 2009, after his fiancée called 911. Maldonado had been having thoughts of hurting himself or hurting others because of the pain he felt from his accident. Dr. Swarna Reddy

diagnosed Maldonado with a mood disorder, personality disorder, hypertension, hypercholesterolemia, and a Global Assessment of Functioning ("GAF") score of 35 out of 100.[1] AR at 243-44.

      e.    <u>Dr. Nagda</u>. Maldonado saw shoulder and sports medicine specialist Sameer Nagda at the Anderson Orthopaedic Clinic, on September 14, 2009. Dr. Nagda examined Maldonado in connection with his complaints of ongoing sharp pain in both shoulders. The pain was reportedly exacerbated by overhead activities, weight-bearing activities, throwing, lifting, carrying, and reaching. During his physical examination, Dr. Nagda found pain-free range of motion in Maldonado's spine and lower extremities with no malalignment, tenderness, instability, weakness or atrophy. Both shoulders were tender. After reviewing the MRIs, Dr. Nagda diagnosed Maldonado with pain in both of his shoulders, adhesive capsulitis, a possible rotator cuff tear, and neck pain. AR at 259-68.

      f.    <u>Dr. Wallach</u>. On September 16, 2009, spinal surgery specialist Corey Wallach examined Maldonado at the Anderson Orthopaedic Clinic. Maldonado reported experiencing "incapacitating" symptoms for six months: specifically significant neck, shoulder, and back pain, as well as pain down the left leg and paresthesia to both upper extremities. He also complained of weakness, decreased sensation, and radiating pain. Maldonado had significant discomfort during the physical exam. Dr. Wallach noted that Maldonado walked with an antalgic gait but was able to

---

[1] The Global Assessment of Functioning is a test that mental health professionals use to measure the functioning of adults, as scored on a numeric scale ranging from 0 to indicate the lowest level of functioning to a high of 100. *See Fiumano v. Colvin*, 2013 WL 5937002, at *3 n.3 (E.D.N.Y. Nov. 4, 2013). A GAF score in the range of 31 to 40 indicates "[s]ome impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work ….)." *Prabhakar v. Life Ins. Co. of N. Am.*, 2013 WL 4458728, at *4 n.11 (E.D.N.Y. Aug. 16, 2013) (quoting Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32 (4th ed. 1994)).

walk independently on his heels and toes. Dr. Wallach found that Maldonado had limited range of motion in his neck due to pain, no focal motor weakness in his upper or lower extremities, and decreased range of motion with significant pain in his back. Dr. Wallach noted that Maldonado suffered excruciating pain when he attempted to move both shoulders, and that Maldonado had limited range of motion and forward flexion and pronounced weakness. However, he noted a negative Spurling's test.[2] Dr. Wallach also noted bilateral paraspinal spasms in Maldonado's back and neck with tenderness to palpation, as well as some decreased light touch sensation in his lower left extremity. After reviewing MRI results, Dr. Wallach diagnosed Maldonado with decreased lordosis and multiple levels of degenerative disc disease in his neck, with "significant" disc herniations at both C5-6, left-sided, and C6-7, right-sided. Dr. Wallach also diagnosed Maldonado with degenerative disc disease in his lumbar spine, most notably at L4-5 and L5-S1 with some mild foraminal stenosis at L5-S1. Maldonado had mild degenerative changes in his thoracic spine. Dr. Wallach observed no full thickness tears in Maldonado's shoulders but saw a possible intrasubstance tear or tendinosis in both shoulders. Dr. Wallach recommended that Maldonado receive steroid injections in his neck. AR at 260-65.

g.  Dr. Messina. Douglas Messina, a neurosurgeon at Carolina Sports Medicine, treated Maldonado thirteen times over the span of nearly two years and also operated on both of Maldonado's shoulders. AR at 368-77, 464-87. During Maldonado's first visit on October 29, 2009, Dr. Messina found that Maldonado walked with a slightly antalgic gait. He also found that Maldonado had tenderness in his neck and pain with range of motion, tenderness in his right

---

[2]  A Spurling's test is an evaluation for cervical nerve root impingement; the test result is considered positive when the subject, upon performing a particular maneuver, reports pain radiating along the arm. *See Valerio v. Comm'r of Soc. Sec.*, 2009 WL 2424211, at *4 n.28 (E.D.N.Y. Aug. 6, 2009).

shoulder and pain with range of motion, tenderness in his left shoulder and pain with resisted abduction, and intact sensation and motor function in his upper extremities. The impression was bilateral shoulder impingement with adhesive capsulitis and a possible rotator cuff tear. Dr. Messina injected pain medications into Maldonado's shoulders for longer term relief and recommended physical therapy. AR at 482.

Dr. Messina operated on Maldonado's right shoulder on January 15, 2010. AR at 376-77. Maldonado recovered well post-operatively with good pain control. AR at 372. Physical exams subsequent to his surgery demonstrated that Maldonado's passive and active elevation, as well as his abduction strength and external rotation in his right shoulder, were improving, though he still experienced pain. AR at 368-370. Maldonado agreed to have surgery on his left shoulder, which suffered from impingement, AC arthropathy, and a possible partial cuff tear. AR at 368. Maldonado underwent surgery on his left shoulder on June 18, 2010. AR at 474-75. Physical exams after surgery on his left shoulder demonstrated that Maldonado's passive and active elevation, abduction strength, and external rotation in both shoulders improved but he reported continuing pain and guarded range of motion. AR at 465, 467-68, 470.

On October 21, 2010, after Maldonado reported that physical therapy was aggravating his neck pain, Dr. Messina told him to discontinue the therapy and instead do stretching and strengthening exercises at home. AR at 468. At the same appointment, Dr. Messina discussed scheduling a Functional Capacity Exam. AR at 467. During his last visit on March 17, 2011, Maldonado reported that he continued to have pain in both shoulders. At that time, Dr. Messina found that he was at maximal medical improvement for his shoulders and that he would likely have continued permanent restrictions for his shoulders. AR at 465.

h.    Dr. Hsu. Maldonado saw Sean S-F Hsu, a neurologist at Neurosurgery Consultants P.A., seven times over the course of one year. AR at 278-88, 459-463. At his first visit on November 10, 2009, Dr. Hsu diagnosed Maldonado with neck pain, cervical radiculitis, cervical disc-osteophyte complexes, mechanical-structural low back pain, and moderate to severe degenerative discs with protrusions in his lumbar spine after reviewing MRIs from April 2009. Dr. Hsu prescribed lumbar support, home interferential stimulation or a TENS unit,[3] and tests for his upper and lower extremities. Further, he recommended a trial of cervical epidural steroid injections and surgery for Maldonado's shoulders and back. AR at 288. Dr. Hsu also noted that Maldonado had had physical therapy "without clear benefit." AR at 288. Two weeks later, on November 23, 2009, Dr. Hsu diagnosed Maldonado with bilateral rotator cuff tears in his shoulders. AR at 285. On February 1, 2010, after his right shoulder surgery, Dr. Hsu diagnosed Maldonado with carpal tunnel syndrome and recommended a trial of braces, as well as continued use of the lumbar support and the TENS unit. AR at 283. On March 9, 2010, Dr. Hsu's diagnoses remained the same. AR at 281. In fact, in all of his physical exams, Dr. Hsu found that Maldonado had reduced flexion and extension in his cervical and lumbar spines with moderate tenderness. AR at 278-88, 459-463. He also found that Maldonado had reduced rotation in his cervical spine and reduced lateral flexion in his lumbar spine. AR at 278-88, 459-463. Dr. Hsu indicated that after physical therapy, Maldonado would likely be at maximal medical improvement for his neck and back. AR at 281. On April 13, 2010, Dr. Hsu recommended that Maldonado remain off work and proceed with a Functional Capacity Exam. AR at 279. On November 2, 2010, Dr. Hsu noted that he and Maldonado had discussed spinal surgery. Maldonado was initially reluctant to consider

_____

[3] A TENS ("transcutaneous electrical nerve stimulation") unit is a small, battery-powered device that uses electrical stimulation to block pain signals and thereby ease chronic pain. *See Kirby v. Astrue*, 2009 WL 1974435, at \*9 n.4 (E.D.N.Y. July 9, 2009).

spinal surgery, but began considering it given the persistence and progression of his neck and low back pain. AR at 462. Based on new MRIs obtained on November 5, 2010, Dr. Hsu recommended further surgical evaluation due to Maldonado's "progressive" symptoms. AR at 460.

i. <u>Dr. Huffmon</u>. Upon a referral from Dr. Hsu, Maldonado saw George V. Huffmon, III, a neurologist and spine specialist at Atlantic Neurosurgical & Spine Specialists, P.A., on January 13 and February 22, 2011. AR at 382-85. During his January visit, Dr. Huffmon reviewed Maldonado's November 2010 MRIs and determined that Maldonado had degenerative disc disease, spondylosis, stenosis, disc bulging, and osteophytes in his neck at C3-4, 5-6, 6-7, and C7-T1, as well as in his lumbar spine at L4-5 and L5-S1. In the physical exam, Dr. Huffmon found that Maldonado had decreased range of motion in all planes of his cervical spine with tenderness and that straight-leg raising[4] on both sides produced low back pain and pain down his legs. Maldonado had markedly decreased range of motion in his shoulders and tenderness. Dr. Huffmon noted that Maldonado's chances of working again were "infinitesimally small" and that his goal was to help Maldonado manage his pain. AR at 385.

At the February appointment, the impression from the myelogram was spondylosis and degenerative disc disease in the neck and back, stenosis in the neck, and calcified discs in the back. Dr. Huffmon opined that without further surgery, Maldonado's permanent work restrictions were no lifting, pushing, or pulling greater than twenty pounds, no bending or stooping, no extreme neck positions, and no driving for more than one hour at a time. He also noted that Maldonado should change positions when necessary to include lying down, if needed. AR at 382-83.

---

[4] Straight-leg raising is a test to diagnose nerve root compression or impingement, which can be caused by a herniated disc. *Valerio*, 2009 WL 2424211, at *3 n.12. The physician raises the extended leg while the patient lies flat. *Id.* If the patient feels any pain in the back at certain angles, the result is positive and may indicate herniation. *Id.*

j.      Dr. Gemelli. Maldonado saw Peter Gemelli, a pain management doctor specializing in the neck and back at the Independence Back Institute, four times over the course of six months. AR at 488-501. At his first visit on February 28, 2011, Maldonado told Dr. Gemelli that his current medication regimen, which at the time consisted of Ultram, Amrix, Mobic, and Neurontin, did not control his pain well. Maldonado complained of constant pain, daytime drowsiness, and weight gain. During the physical examination, Maldonado felt pain when asked to bend and extend his neck and back. Dr. Gemelli found decreased range of motion and pain in Maldonado's shoulders, but found that Maldonado's motor function in the lower extremities registered a score of five out of five. Dr. Gemelli diagnosed Maldonado with cervical and lumbar degenerative disc disease, chronic pain, and bilateral rotator cuff tendonitis. Dr. Gemelli recommended against more epidural injections because they did not relieve Maldonado's symptoms. Dr. Gemelli also adjusted Maldonado's Amrix doses to account for his daytime drowsiness and decreased his dosage of Neurontin to account for his weight gain. Dr. Gemelli prescribed Amrix, Mobic, Neurontin, Ultram, and Ultram ER. AR at 494-96.

At his visit on March 25, 2011, Dr. Gemelli recommended that Maldonado continue all his medications and decrease his intake of Neurontin as suggested. AR at 493. Three months later on June 17, 2011, Maldonado complained of inadequate pain control, insomnia, and daytime drowsiness. He characterized the pain as constant, shooting, stabbing, tender, and burning. Dr. Gemelli prescribed Ambien, Butrans, Mobic, Neurontin, and Ultram and stopped the Amrix and Ultram ER prescriptions. AR at 488-90. At his last visit on July 1, 2011, Maldonado said the Ambien was giving him headaches. Dr. Gemelli stopped his Ambien prescription, increased his Ultram and Neurontin intakes, and started him on Trazodone. AR at 498-500.

k.     Physical Therapy. Maldonado began a series of physical therapy sessions at Jacksonville Physical Therapy in February 2010 after his first shoulder surgery through September 2010. AR at 289-367, 393-458. At the initial evaluation on February 8, 2010, the therapist noted that Maldonado's signs and symptoms were consistent with the diagnosis of right shoulder rotator cuff repair and bicep tenodesis. AR at 292. The therapist found that medicine relieved the sharp, radiating pain in his shoulders but that lifting his arms, sudden movements, sleeping, dressing, and carrying weighted objects exacerbated it. AR at 290.

At subsequent sessions, the therapist noted Maldonado's pain level in his shoulders remained at a level of seven to eight on a ten-point scale, and that he was making slow gains in increasing his range of motion. AR at 295-318. The therapist's notes indicated that Maldonado felt neck stiffness, numbness, and tingling on March 10, 2010. AR at 314. On March 17, 2010, the therapist noted that Maldonado's progress was slow, but that his range of motion, strength, and stability had increased. AR at 321. Maldonado continued to make slow progress and experience the same level of sharp pain during the rest of March through September, with a brief decrease in pain in August. AR at 393, 404, 406, 408, 410, 413-14, 418, 423, 425, 427, 429, 431, 433, 435-36, 444, 446-47. During some sessions, Maldonado only worked on his shoulders because his back and neck were too sensitive. AR at 344, 353.

On April 15, 2010, Maldonado stopped therapy for his back. AR at 355. During several sessions in July and August of 2010, the therapist noted that Maldonado "tolerated" all the exercises. AR at 402, 404, 406, 408, 410, 411-13. Towards the end of Maldonado's time in physical therapy, the therapist noted that though Maldonado had showed some gains in strength, range of motion, and endurance, he continued to have problems with high pain. AR at 397, 418.

3.     <u>SSA Examiners</u>

As part of the administrative review process, three doctors provided assessments of Maldonado to the SSA, as summarized below.

a.     <u>Dr. Kumar</u>. On June 10, 2010, physician Sankar Kumar performed a physical RFC assessment based on his review of Maldonado's medical records, but did not personally examine Maldonado. Dr. Kumar found that Maldonado had the following limitations: (1) occasionally lifting or carrying twenty pounds; (2) frequently lifting or carrying ten pounds; (3) standing and walking for six hours in an eight-hour workday; (4) sitting for more than six hours on a sustained basis in an eight-hour workday; (5) limited pushing and pulling in upper extremities; (6) occasionally climbing ramps, stairs, ropes, and scaffolds; and (7) occasionally balancing. Dr. Kumar found that Maldonado had no limitations in his ability to stoop, bend, kneel, crouch, crawl, handle, finger, or feel. Dr. Kumar concluded that Maldonado retained the RFC to perform light work. AR at 90-91.

b.     <u>Dr. Fulmer</u>. On August 10, 2010, psychologist Jennifer Fulmer performed a mental RFC assessment based on her review of Maldonado's medical records, but did not personally examine Maldonado. Dr. Fulmer found that Maldonado was moderately limited in several areas, including his ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for an extended period; to perform activities within a schedule, maintain regular attendance, and be punctual; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work

setting. Notwithstanding those limitations, Dr. Fulmer found that Maldonado retained the ability to function in a low-stress work setting. AR at 92-93.

       c.      <u>Dr. Farmer</u>. Maldonado saw psychologist C. Craig Farmer for a psychological assessment at the Commissioner's request on July 12, 2010. Dr. Farmer observed that Maldonado was somewhat irritable and physically uncomfortable due to pain. He also observed that Maldonado was depressed but that he had clear thought processes, adequate memory, and adequate thinking ability and judgment. Dr. Farmer diagnosed Maldonado with major depression and a GAF score of 50 out of 100.[5] He concluded that Maldonado's ability to sustain attention to perform simple repetitive tasks was "possibly somewhat limited" due to his chronic pain and medication regimen. Dr. Farmer also noted that Maldonado's ability to relate to others and to tolerate the stress and pressure associated with daily work activities may be "limited" due to his irritability. He concluded that Maldonado needed mental health treatment. AR at 378-81.

### 4.    Vocational Expert Testimony

      At the hearing, the ALJ asked vocational expert Julie Sawyer-Little to assume the existence of a hypothetical individual with the same age, education, and work experience as Maldonado, and to further assume that this individual could perform light exertional work with the following limitations: (1) only occasionally climbing stairs or ramps; (2) only occasionally bending, balancing, stooping, crawling, kneeling, or crouching; (3) never climbing ropes, ladders, or scaffolds; (4) avoiding occupations with hazardous machinery; (5) only occasionally pushing or pulling with the upper extremities; (6) only occasionally reaching overhead bilaterally; and (7) only doing simple, repetitive tasks. Based on that assumption, the ALJ asked Sawyer-Little

---

[5] A GAF score in the range of 41 to 50 signifies "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job, cannot work)." *Fiumano*, 2013 WL 5937002, at *10 n.10.

whether the hypothetical individual would be able to perform Maldonado's previous job as a chemist/salvage laborer. AR at 68-69. Sawyer-Little answered in the negative, but added that such a person could be a cashier, photocopy machine operator, or an office helper. AR at 69. When the ALJ added the option to sit or stand while working and frequent fingering, handling, and grasping to the hypothetical, Sawyer-Little testified that that hypothetical individual could still perform the jobs she identified. AR at 70. Sawyer-Little said that her response would not be the same if the hypothetical individual also missed work four or more days per month. AR at 70.

On cross-examination, Maldonado's attorney presented a hypothetical individual to Sawyer-Little with the same age, education, and work history as Maldonado but who was limited to: (1) sitting thirty minutes at a time; (2) standing ten minutes at a time; (3) lifting no more than ten pounds; (4) no overhead reaching with both upper extremities; (5) no movement of the neck more than occasionally; (6) no bending or stooping; and (7) sitting or standing as needed. AR at 70-71. Sawyer-Little testified that such an individual would not be able to perform Maldonado's past work or any other jobs in the national and/or local economy. AR at 71.

II.    Discussion

       A.    Standard of Review

       In reviewing the Commissioner's decision, I must first decide whether the ALJ applied the correct legal standards, and reverse the administrative decision if he did not. *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). If I conclude the ALJ applied the correct standards, I must next decide whether substantial evidence supported his conclusions. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987) (citing 42 U.S.C. § 405(g)). In this context, "substantial evidence"

means "more than a mere scintilla" or that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008). Further, "it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Even where the administrative record may also adequately support contrary findings on particular issues, I must give "conclusive effect" to the ALJ's factual findings "so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming an ALJ decision where substantial evidence supported both sides). Finally, while the ALJ need not resolve every conflict in the record, *see Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984); *accord Campbell v. Astrue*, 465 F. App'x 4, 6 (2d Cir. 2012).

B.      The Five-Step Sequential Evaluation

To qualify for disability benefits, Maldonado must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In applying that standard to determine eligibility, the

17

Commissioner (or, in the first instance, the ALJ), conducts a five-step sequential evaluation.

*Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986); *Tejada*, 167 F.3d at 774.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Lawler v. Astrue*, 512 F. App'x 108, 110 (2d Cir. 2013) (quoting *Tejada*, 167 F.3d at 774); 20 C.F.R. § 404.1520(a)(4)(i)-(v).

The parties agree that the ALJ properly conducted the first three steps described above, and correctly concluded that Maldonado is not currently engaged in substantial gainful activity, has a severe impairment that significantly limits his physical or mental ability to do basic work activities, and that his impairment is not on the regulatory list of conditions that warrants a finding of disability without further review. They disagree as to the remainder of the analysis. Specifically, Maldonado asserts that in conducting the fourth and fifth steps of the eligibility determination, the ALJ made four errors: he failed to properly apply the treating physician rule; he failed to properly evaluate Maldonado's mental impairments; he considered improper evidence when determining Maldonado's credibility; and he failed to present proper hypotheticals to the vocational expert. DE 18 at 12-14. The Commissioner disputes each of those contentions.

C.     The Treating Physician Rule

"A treating physician's opinion is entitled to controlling weight with respect to the nature and severity of a claimed impairment if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" *Carvey v. Astrue*, 380 F. App'x 50, 51 (2d Cir. 2010) (quoting 20 C.F.R. § 404.1527(d)(2)). Affording the opinions of treating physicians controlling weight reflects the reasoned judgment that treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).

The ALJ is not bound to give treating physicians' opinions controlling weight if they are inconsistent with other substantial evidence in the record, including the opinions of other medical experts. *Burgess*, 537 F.3d at 128; 20 C.F.R. § 404.1527(d)(2). It is possible for the opinions of medical experts to "override treating sources' opinions and be given significant weight, so long as they are supported by sufficient medical evidence in the record." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 276 (S.D.N.Y. 2010) (citing, *inter alia*, *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995)). Nevertheless, the general rule is that expert opinions are "entitled to relatively little weight," at least "where there is strong evidence of disability in the record." *Calzada*, 753 F. Supp. 2d at 277 (citing *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992)); *see also Reyes v. Barnhart*, 226 F. Supp. 2d 523, 528 (S.D.N.Y. 2002) (noting that the treating physician rule applies with special force where the outside expert's examination "is for the purposes of the

disability proceeding itself"). Moreover, while "[t]he findings of such consulting doctors are to be treated as opinion evidence pertinent to the nature and severity of the claimant's medical condition[,] [t]hey are not to be relied upon ... for the ultimate determination of disability." *Calzada*, 753 F. Supp. 2d at 276 (internal citation omitted).

Even where a treating physician's opinion is not controlling because it is inconsistent with other medical evidence that might be considered "substantial," it "is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 330 (S.D.N.Y. 2009) (internal citation omitted). If the ALJ gives the treating physicians' opinions less than controlling weight, he must specify "good reasons," *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)), and must justify the alternate weight by referring to four factors listed in the Social Security regulations: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (internal citation and quotation marks omitted) (finding ALJ erred by crediting findings of non-examining state disability adjudicator, who was not a physician, because treating physicians' opinions were entitled to controlling weight in light of the four factors); 20 C.F.R. § 404.1527(c). Failure to provide "good reasons" for discrediting the opinion of a plaintiff's treating physician or failure to justify giving less than controlling weight with reference to the Social Security regulations is a ground for remand. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *Balke v. Barnhart*, 219 F. Supp. 2d 319, 322-23 (E.D.N.Y. 2002) (remanding where the ALJ failed to justify disregard of the treating physicians' opinions).

1. <u>Physical RFC Assessment</u>

Maldonado argues that in determining his RFC, the ALJ violated the treating physician rule twice: by failing to give controlling weight to Dr. Huffmon's opinion (which was consistent with the relevant MRIs and the findings of Dr. Hsu and Dr. Gemelli) and by giving greater weight to Dr. Kumar, who did not examine Maldonado and rendered his opinion for purposes of the disability proceeding. DE 18 at 12. I agree.

The ALJ concluded that Dr. Huffmon's opinion was only entitled to "some" weight for three reasons: first, Maldonado's lumbar condition had received very little treatment and his complaints about it, when compared to his neck and shoulder complaints, were very few; second, the MRIs showed only mild to moderate degenerative changes; third, "the physical findings and objective studies exhausted above" did not support Dr. Huffmon's opinion that Maldonado needed to lie down to make it through a work day; and fourth, Maldonado took a three-hour flight to the Dominican Republic, which persuaded the ALJ that Maldonado could maintain a position for an extended period of time. AR at 17. By contrast, the ALJ gave "great" weight to non-examining physician Dr. Kumar's opinion because he was familiar with the disability review process and no medical evidence submitted subsequent to his RFC determination rendered it any less persuasive. AR at 16-17.

Such misapplication of the treating physician rule requires (at a minimum) remand. First, the ALJ failed to acknowledge or consider substantial medical evidence from Dr. Hsu and Dr. Gemelli that was consistent with Dr. Huffmon's opinion and provided a basis for giving the latter opinion more than "some" weight. Dr. Hsu's medical records demonstrate Maldonado's deteriorating condition. At Maldonado's first visit on November 10, 2009, Dr. Hsu diagnosed him

with degenerative disc-osteophyte complexes in his neck and "moderate to severe" degenerative discs with protrusions in his back. AR at 288. By Maldonado's last visit one year later on November 22, 2010, Dr. Hsu had diagnosed Maldonado with multilevel degeneration with "advanced" degenerative disc-osteophyte complexes in his neck, "advanced" degeneration in his back, bilateral rotator cuff tears, and bilateral carpal tunnel syndrome based on MRIs taken on November 5, 2010. AR at 460. Dr. Hsu called Maldonado's symptoms "progressive" and recommended further surgical evaluation. AR at 460. Dr. Hsu's diagnoses and prescriptions are consistent with Dr. Huffmon's opinion about Maldonado's very limited functional abilities.

Dr. Gemelli's records are also consistent with Dr. Huffmon's opinion. Dr. Gemelli initially prescribed Maldonado five different pain relievers: Amrix, Mobic, Neurontin, Ultram, and Ultram ER. AR at 496. Dr. Gemelli also noted that epidural injections were not giving Maldonado any relief from his pain. AR at 496. By his last visit on July 1, 2011, Maldonado was on seven different medications, five of which were for his pain. AR at 498. In all of his physical examinations, Dr. Gemelli found that Maldonado tested positive for straight-leg raising in both legs, which may have indicated a herniated disc in his back. AR at 488-97. Maldonado's many prescriptions demonstrate that his pain was persistent and strong. Even with medication, he consistently reported – and Dr. Gemelli consistently observed – that his pain levels only decreased, on a ten-point scale, from a ten to a low of six, with an average at the severe level of eight. AR at 488, 491, 494. Dr. Gemelli's prescriptions and physical examination results are consistent with Dr. Huffmon's assessment of Maldonado's functional limitations. While the ultimate determination of disability rests within the ALJ's discretion, his failure to acknowledge or consider substantial evidence from Dr. Hsu and Dr. Gemelli consistent with Dr. Huffmon's opinion was plain error requiring remand. *See Kane v.*

*Astrue*, 2013 WL 1785497, at *8 (E.D.N.Y. Apr. 26, 2013) (remanding for ALJ's failure to mention or consider substantial evidence supporting treating physician's opinion).

A second and independent basis for remand is that the ALJ failed to give good reasons for giving Dr. Huffmon's opinion less than controlling weight. *See Balodis v. Leavitt*, 704 F. Supp. 2d 255, 267 (E.D.N.Y. 2010) (remanding for ALJ's failure to apply treating physician rule because, *inter alia*, there was "no reference in the ALJ's decision to the various factors that must be considered in deciding what weight to give the opinion of a treating physician."). The ALJ did not consider any of the factors listed in 20 C.F.R. § 404.1527(c); the ALJ simply stated that Dr. Huffmon's conclusions "were not supported by the record" or by "the physical findings and objective studies exhausted above." AR at 17. Such general statements are not sufficiently specific to be of any use in my effort to determine whether the ALJ's determination was supported by substantial evidence. Further, to the extent the stated reasons shed light on the ALJ's reasoning, they appear not to constitute "good reasons" under the applicable regulations. First, the ALJ was not at liberty to substitute his own lay opinion that Maldonado's 2009 MRIs showing only mild to moderate degenerative disease in his back allowed occasional bending and stooping for the opinions of Maldonado's treating physicians who are more qualified and better suited to opine on those tests' medical significance. *See Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (finding that the ALJ improperly substituted his own interpretation of an MRI of claimant's lumbar spine showing mild degenerative changes against that of treating physician who opined claimant had significant back pain). Notably, Dr. Hsu reviewed the same 2009 MRIs as had Dr. Kumar and opined that Maldonado suffered from moderate to severe degenerative discs with protrusions in his lumbar spine and required surgery. AR at 288.

The ALJ erred further by failing to explain why he relied on MRIs that were taken early in the alleged disability period, and by failing to reconcile those early results with the later test results – specifically, the November 2010 MRIs and February 2011 myelogram – that demonstrated the deterioration of Maldonado's lumbar condition. To be sure, Maldonado did not receive as much treatment for his back as he did for his neck and shoulders – but the record nevertheless demonstrates that Maldonado suffered from advanced degenerative disease in his back that caused him pain, which he reported to his doctors and for which he received several pain medications.

Finally, it was wholly unreasonable for the ALJ to discount Dr. Huffmon's opinion on the basis of his inference, from Maldonado's three-hour flight for a family emergency, that he could maintain a position for an extended period. The Commissioner has previously sought in vain to defend a virtually identical error in this court. *See Kirby*, 2009 WL 1974435, at *19 (finding that it was not reasonable to infer from three-hour flight taken annually that plaintiff could sit for six hours a day on a regular and continuing basis). Moreover, in citing Maldonado's flight in this respect, the ALJ also disregarded not only Maldonado's testimony about the discomfort he had experienced during the flight, AR at 64, but also his own observation that Maldonado had changed positions during the administrative hearing to relieve his pain. AR at 47.

In addition to providing insufficient reasons for discounting Dr. Huffmon's opinion, the ALJ also erred in failing to explain, by reference to the factors relevant under the pertinent regulation, why he gave "great weight" to Dr. Kumar's opinion and relied on it rather than on the opinion of Maldonado's treating physician. Dr. Kumar – who unlike Dr. Huffmon, does not specialize in neurology or spinal injuries – never met or examined Maldonado, but rather based his opinion on his medical file. *See Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996) (ALJ erred in

relying on medical expert's opinion that applicant was capable of light work where the opinion relied exclusively on records that were either illegible or supportive of applicant's disability claim; such evidence provided "no basis to find the substantial evidence necessary to uphold the ALJ's decision") (citing *Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990) (stating that a doctor's assessment of other doctor's findings merits "little weight" in a disability determination)). Not having examined Maldonado, Dr. Kumar's opinion cannot constitute substantial evidence and normally may not override a treating source's opinion unless it is supported by sufficient medical evidence in the record. *See*, *e.g.*, *Williams v. Astrue,* 2013 WL 5532694, at *15 (E.D.N.Y. Sept. 30, 2013); *Roman v. Astrue*, 2012 WL 4566128, at *16 (E.D.N.Y. Sept. 28, 2012). As detailed above, the medical evidence showing Maldonado's deteriorating lumbar condition does not support Dr. Kumar's opinion that Maldonado retains the RFC to do light work and therefore, his opinion should not have been given significant weight. The ALJ's failure to explain how application of the pertinent regulatory factors justified favoring Dr. Kumar's opinion over Dr. Huffmon's was therefore improper and requires remand. *See Burgess*, 537 F.3d at 130-32 (remanding due to ALJ's failure to give good reasons for adopting non-examining expert's findings over those of treating physician).

Moreover, the ALJ was simply incorrect in stating that no medical evidence obtained subsequent to Dr. Kumar's RFC determination rendered it any less persuasive. AR at 16-17. As noted above, after Dr. Kumar rendered his opinion in January 2010, both Dr. Hsu and Dr. Huffmon found that Maldonado suffered from advanced spinal disorders in his lower back; those findings contrasted with the mild degenerative changes Maldonado's doctors initially found after his accident. Moreover, Dr. Hsu characterized Maldonado's symptoms as "progressive." Dr. Gemelli

also made pertinent findings after the date of Dr. Kumar's report: he noted that Maldonado complained that a variety of prescribed pain medications did not adequately alleviate Maldonado's pain, and he found that Maldonado tested positive for straight-leg raising – indicating that Maldonado could have herniated discs in his back. It is of course conceivable that the ALJ may have found a sufficient basis to rely on Dr. Kumar's opinion despite such subsequent developments, but for the ALJ to ignore such evidence and assert that *no* medical evidence undermined Dr. Kumar's opinion is plainly erroneous.

On remand, the ALJ shall reassess Maldonado's RFC and set forth his findings; if he continues to assign less than controlling weight to Dr. Huffmon's opinion, the ALJ must provide good reasons for doing so, with reference to the factors in the applicable regulations. *See* 20 C.F.R. §§ 404.1527(c)(2)-(6). Additionally, the ALJ shall specify which of the functional limitations that Dr. Huffmon identified, if any, are not supported by Maldonado's treatment records and identify the treatment notes, objective findings, and other evidence, if any, that are inconsistent with Dr. Huffmon's opinion. Finally, the ALJ shall reconcile Dr. Huffmon's opinion with that of Dr. Kumar and other evidence in the record, explaining what evidence he relied upon to determine Maldonado's RFC.

## 2. Mental RFC Assessment

Maldonado also contends that the ALJ erred in evaluating his mental impairments. DE 18 at 13. Specifically, Maldonado points to the fact that the ALJ disregarded evidence from treating physicians at Prince William Hospital as well as the SSA's own consultative examiner Dr. Farmer that tended to show that Maldonado was suffering from depression as well as other mental health problems, and instead relied on the findings of non-examining review psychologist Dr. Fulmer.

The ALJ gave only "some" weight to Dr. Farmer's opinion, which he characterized as "vague," because Dr. Farmer neither qualified the limitations he recommended for Maldonado nor indicated the type of work tasks those limitations would prevent. The ALJ also disregarded Dr. Farmer's GAF score because he believed that neither Dr. Farmer's ultimate conclusion – namely, that Maldonado could understand, retain, and follow instructions with only some limitations – nor the overall record reflecting little mental health treatment supported such a score. In addition to disregarding Dr. Farmer's GAF score, the ALJ likewise concluded that the GAF score on the test administered to Maldonado during his hospitalization at Prince William Hospital was not an accurate representation of his level of functioning throughout the alleged disability period. AR at 18. Instead, the ALJ assigned "great" weight to Dr. Fulmer's opinion on the ground that she is familiar with disability regulations and no additional records rendered it any less persuasive, as well as because her opinion was, in the ALJ's view, consistent with the record of Maldonado's scant mental health treatment and with Dr. Farmer's opinion. AR at 17.

I agree that the ALJ erred by relying to such an extent on Dr. Fulmer's opinion. In the context of evaluating a mental disability, "it is improper to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient." *Fofana v. Astrue*, 2011 WL 4987649, at *20 (S.D.N.Y. Aug. 9, 2011) (quoting *Velazquez v. Barnhart*, 518 F. Supp. 2d 520, 524 (W.D.N.Y. 2007)). Accordingly, "the conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little, if any, weight." *Filocomo v. Charter*, 944 F. Supp. 165, 170 n. 4 (E.D.N.Y. 1996). As found above with Dr. Kumar, the ALJ committed error in giving Dr. Fulmer's RFC assessment "great weight" because she never

examined or treated Maldonado and relied solely on the medical records in the administrative record to form her opinion.

In the absence of any treating mental health physician,[6] the ALJ should have given greater weight to Dr. Farmer's assessment in determining Maldonado's mental health RFC, than to Dr. Fulmer's. *See Fofana*, 2011 WL 4987649, at *20 (noting that a consultative physician's opinion should be given more weight than that of "a non-examining, nontreating source who merely conducts a paper review"). However, the ALJ could not properly do so because Dr. Farmer's opinion contained inconsistencies and ambiguities that rendered it useless to help the ALJ determine Maldonado's RFC. An ALJ must affirmatively develop the record, even when a claimant is represented by counsel, in light of the non-adversarial nature of a Social Security disability benefits proceeding. *See Moran*, 569 F.3d at 112. The ALJ "bears this duty as part of the requirement to 'seek additional evidence or clarification from [the] medical source when a report from [that] medical source contains conflict or ambiguity that must be resolved, [or] the report does not contain all the necessary information.'" *Calzada*, 753 F. Supp. 2d at 277 (quoting regulation formerly codified at 20 C.F.R. § 404.1512(e)(1)).

Accordingly, it was not enough for the ALJ to discount Dr. Farmer's RFC assessment based on his failure to qualify Maldonado's limitations or to indicate what type of work tasks those limitations would prevent. The ALJ had an affirmative duty to develop the record and use reasonable efforts to seek the additional information from Dr. Farmer that would clarify his RFC assessment. The ALJ was also obligated to resolve the inconsistency between Dr. Farmer's GAF score representing serious mental health symptoms and his relatively moderate mental health

---

[6] Maldonado testified that he could not afford such treatment, and that he saw a psychiatrist "maybe twice" in Virginia – which may or may not refer to his stay at Prince William Hospital in Virginia. AR at 65.

findings. On remand, the ALJ is directed to develop the record as to the ambiguity of Dr. Farmer's RFC assessment and the inconsistency between Dr. Farmer's GAF score and his findings.[7]

D.    Credibility Determination

Maldonado also argues that the ALJ improperly discounted his subjective complaints about his symptoms. Specifically, Maldonado asserts that it was improper for the ALJ to base his credibility determination on the fact that Maldonado took a three-hour flight to the Dominican Republic for a family emergency and that he refused to undergo neck surgery because he was satisfied with current pain treatment. DE 18 at 12-13. In his decision, the ALJ found that Maldonado suffered from medically determinable impairments that could reasonably be expected to cause the alleged symptoms, but found that Maldonado's statements about the intensity, persistence, and limiting effects of his symptoms were not credible "to the extent they [were] inconsistent with the above residual functional capacity assessment." AR at 15.

When determining a claimant's RFC, "symptoms, including pain, will be determined to diminish [a claimant's] capacity for basic work activities to the extent that ... [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). To that end, the Commissioner has established a two-step inquiry to evaluate a claimant's subjective descriptions of pain. *See* 20 C.F.R. § 404.1529(c); Social Security Ruling 96–7P, 1996 WL 374186 ("SSR"). First, the ALJ must determine whether the claimant suffers from a "medically determinable impairment[] that could reasonably be expected to produce" the

---

[7] While this action has been pending in this court, the SSA has issued guidance limiting the use of GAF scores. *See Mainella v. Colvin*, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014). In general, the guidance instructs ALJs to treat GAF scores as opinion evidence and to use the details of the clinician's description rather than a numerical range when assessing mental disability. *Id.* The ALJ should of course apply such guidance on remand and properly develop the record with respect to Dr. Farmer's assessment of Maldonado's mental limitations and the way they would constrain his ability to work.

symptoms alleged. 20 C.F.R. § 404.1529(c)(1); *see* SSR, 1996 WL 374186, at \*2. Once the ALJ

answers the first question in the affirmative, then the ALJ must evaluate the claimant's statements

about the intensity and persistence of those symptoms considering the entire case record, including

medical signs and laboratory findings, the individual's own statements about his symptoms, any

information provided by treating physicians or other persons about the symptoms and how they

affect the individual, and any other relevant evidence in the record. *See* SSR, 1996 WL 374186, at

\*2. Evidence that the claimant's own statements about his symptoms are consistent with

information from medical sources, laboratory findings, and reports and observations concerning

the claimant's daily activities, behavior, and efforts to work are strong indications of the claimant's

credibility. *See id.* at \*5-6.

Any statements that are not consistent with medical evidence in the record are subject to a

credibility analysis. *Meadors*, 370 F. App'x at 184. In this analysis, the ALJ must consider:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and
> intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage,
> effectiveness, and side effects of any medications taken to alleviate the pain; (5)
> any treatment, other than medication, that the claimant has received; (6) any other
> measures that the claimant employs to relieve the pain; and (7) other factors
> concerning the claimant's functional limitations and restrictions as a result of the
> pain.

*Id.* at 184 n.1 (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)); *see also* SSR, 1996 WL 374186, at \*3.

Remand is appropriate when the ALJ fails to sufficiently explain a finding that the claimant's

testimony was not entirely credible. *Valet v. Astrue*, 2012 WL 194970, at \*22 (E.D.N.Y. Jan. 23,

2012).

I disagree with Maldonado's contention that the ALJ erred by considering the three-hour

plane flight and Maldonado's refusal to undergo neck surgery; to the contrary, the ALJ must

consider any relevant evidence in the record when making a credibility determination. *See*, *e.g.*,

*Tamborra v. Heckler*, 606 F. Supp. 1023, 1029 (S.D.N.Y. 1985) (considering plaintiff's refusal to undergo surgery as one factor in credibility determination); *see also* SSR 96-7P at *2 (stating that ALJ can consider other relevant evidence in the record in credibility determination). However, I agree with Maldonado that the ALJ erred by failing to place those two facts in context. Specifically, the ALJ failed to consider Maldonado's testimony that the flight was "difficult" for him and that his trip was out-of-the-ordinary; otherwise, Maldonado has consistently asserted that he must change positions to alleviate his pain or stay in a recliner or bed all day. Also, the ALJ's conclusion that Maldonado refused surgery because he was satisfied with his current pain treatment was flawed because there is no evidence in the record to support the proposition that Maldonado's assessment of the efficacy of his pain medication was the basis of his decision to forego surgery. To the contrary, Maldonado told Dr. Hsu and testified at the hearing that he would consider the surgery if his pain worsened or became more frequent. AR at 56, 462.

The ALJ may have made another error that I note *sua sponte* to provide guidance on remand. Applicable regulations required the ALJ to assess the credibility of Maldonado's statements and only then go on to determine his RFC. *See Yu v. Astrue*, 2013 WL 4046255, at *13 (E.D.N.Y. Aug. 8, 2013). In a formulation that suggested a clear violation of that rule, the ALJ announced his RFC assessment and then wrote that Maldonado's statements were not credible "to the extent they [were] inconsistent with [that RFC] assessment." AR at 15; *see Otero v. Colvin*, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013) ("[I]t makes little sense to decide on a claimant's RFC prior to assessing her credibility. It merely compounds the error to then use that RFC to conclude that a claimant's subjective complaints are unworthy of belief."). While it is of course possible that the ALJ had made credibility determinations about each of Maldonado's

assertions and used those determinations in crafting his RFC, the more natural reading of the ALJ's opinion is that the ALJ determined the kind of work he believed Maldonado could do, and then as a result of that determination rejected any assertion Maldonado had made to the contrary. Either way, remand is appropriate based on the ALJ's use of a shorthand credibility determination that judges of this court have repeatedly rejected. *See*, *e.g.*, *Yu*, 2013 WL 4046255, at *13 (remanding where ALJ employed the same "to the extent … inconsistent" formulation used here); *Romanelli v. Astrue*, 2013 WL 1232341, at *11 (E.D.N.Y. Mar. 26, 2013) (same); *Otero*, 2013 WL 1148769, at *7 (same); *Pereyra v. Astrue*, 2012 WL 3746200, at *15 (E.D.N.Y. Aug. 28, 2012) (same); *Smollins v. Astrue*, 2011 WL 3857123, at *10 (E.D.N.Y. Sept. 1, 2011) (same). On remand, the ALJ should assess Maldonado's credibility before determining his RFC and identify which statements about the intensity and persistence of his symptoms are consistent with specifically identified evidence in the record. To the extent the ALJ on remand determines that any of Maldonado's statements are inconsistent with medical evidence in the record, the ALJ should specify those statements and explain why he chooses to discredit them with reference to the applicable regulatory factors. *See* 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

E.    Hypotheticals Presented to the Vocational Expert

Maldonado's last argument is that the ALJ erred in framing his hypothetical question to the vocational expert by omitting such items as Maldonado's bipolar disorder, depression, his GAF score of 50, his irritability, his limited ability to tolerate usual workplace stress and pressure, and the moderate limitations that Dr. Farmer had identified. Without taking such aspects of the record into account in asking for the vocational expert's opinion, Maldonado contends that the ALJ did

not elicit a valid opinion on which he could properly rely in determining that Maldonado has the ability to perform a significant number of jobs in the national economy. DE 18 at 14.

The vocational expert at a Social Security hearing assists the Commissioner in meeting his burden by determining whether there are other jobs in the national economy that the claimant can perform. *See Draegert v. Barnhart*, 311 F.3d 468, 469 (2d Cir. 2002). The vocational expert relies on the ALJ's instructions as to the claimant's RFC, as opposed to relying on treating physician reports or the claimant's testimony. *See Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir. 1983). An ALJ "may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence and accurately reflect the limitations and capabilities of the claimant involved." *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009) (internal citations omitted).

Because I find that remand is proper on the basis of the ALJ's failure to properly determine Maldonado's RFC for the reasons stated above, I need not and do not resolve this issue. The ALJ's errors resulted in a flawed five-step analysis that requires remand. Should the ALJ reach the fifth step of the required analysis on remand, the ALJ should obtain new testimony from a vocational expert on whether, based on substantial evidence in the record, Maldonado can perform his past work or there exist other jobs in the national economy that he can perform. *See*, *e.g.*, *Duncan v. Astrue*, 2011 WL 1748549, at *25 (E.D.N.Y. May 6, 2011) (new vocational expert testimony required on remand where court found error in the ALJ's analysis of plaintiff's limitations and capabilities); *Roth v. Astrue*, 2008 WL 5585275, at *25 (D. Conn. Nov. 14, 2008) (new vocational expert testimony required in light of court's finding that ALJ needed to reassess plaintiff's RFC on remand).

F.    Scope of the Remand

Remand solely for the calculation of benefits is not warranted in this case. A remand for calculation of benefits is appropriate only when application of the correct legal standard "could lead to but one conclusion." *See Gonzalez v. Astrue*, 2008 WL 755518, at *9 (E.D.N.Y. Mar. 20, 2008) (citing *Schaal v. Apfel*, 132 F.3d 496, 504 (2d Cir. 1998)). Having determined that the ALJ erred in conducting the required five-step sequential evaluation, I cannot conclude with such certainty that Maldonado is eligible for disability benefits, and therefore do not limit the scope of the remand.

III.    Conclusion

For the reasons set forth above, I grant in part and deny in part the plaintiff's motion for judgment on the pleadings, deny the defendant's cross-motion for judgment on the pleadings, and remand this case to the Commissioner of Social Security for further proceedings consistent with this opinion.

SO ORDERED.

Dated: Brooklyn, New York
        February 10, 2014

_____/s/_____
JAMES ORENSTEIN
U.S. Magistrate Judge